IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS DONNELLY, III, an individual,     CIVIL DIVISION

        Plaintiff,     No.: 2:22-cv-00377

   vs.

GENERAL ELECTRIC COMPANY, a
foreign entity; and JOENIC STEEL, LLC, a
foreign entity,

        Defendants.

**BRIEF OF JOENIC STEEL, LLC IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

AND NOW, comes Joenic Steel, LLC, by its attorneys, Meyer, Darragh, Buckler,

Bebenek & Eck, PLLC, and presents the following brief in support of motion for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure averring

in support thereof:

## I.     ISSUE

**MUST THE COURT GRANT SUMMARY JUDGMENT IN FAVOR OF JOENIC
STEEL, LLC ON THE BASIS THAT THERE IS NO GENUINE ISSUE OF
MATERIAL FACT CONCERNING THE ABSENCE OF ANY CAUSAL
CONNECTION BETWEEN ANY ALLEGED DEFECTS OR DEFICIENCIES IN
THE MATERIALS, DRAWINGS, AND INSTRUCTIONS PERTAINING TO THE
EXPANSION JOINT PROVIDED BY JOENIC STEEL AND GENERAL
ELECTRIC FOR THE CONSTRUCTION OF A POWER PLANT AT THE HILL
TOP ENERGY CENTER?**

**ANSWER:   YES.**

## II.     STATEMENT OF THE CASE

The incident giving rise to this matter occurred on September 24, 2020 at the Hill

Top Energy Center located in Cumberland Township, Greene County, Pennsylvania, at

approximately 9:45 a.m.   The plaintiff, Thomas Donnelly, was employed by Kiewit

{P1991948.1}

Power Constructors ("Kiewit") as a boilermaker along with a number of other boilermakers hired out of the local union hall in Pittsburgh, Pennsylvania. Mr. Donnelly, as well as all of the boilermakers who were working on the job were very experienced in many aspects of the trade, including rigging and supervising the lift of materials and products for assembly in an energy center such as the one located at the Hill Top Energy Center. Kiewit is a national, very large construction company which has been involved in the construction of many energy centers throughout the United States. General Electric ("G.E.") is obviously a very large company and one of its divisions designs and develops gas powered turbines and generators for power plants. Joenic Steel, LLC ("Joenic") was a subcontractor to G.E. on this particular project and provided the steel components necessary to construct the power plant. Joenic prepared detailed drawings based on the information provided by G.E. which detailed drawings were reviewed and approved by G.E. to ensure compliance with the specifications and accuracy. The actual manufacture of the component parts which were supplied by Joenic was performed at a steel mill located in China. The various components, including expansion joints for the duct work in the filter house were shipped from China to the west coast and then transported by truck to the job site in Greene County.

One of the components involved in the assembly was a large item called an expansion joint. Due to the size of the expansion joint, it had to be shipped in two halves. The instructions provided by the defendants indicated that the expansion joint should be lifted in one piece if possible. However, either half of the expansion joint could be lifted safely if properly rigged and all component parts were in place. There is

{P1991948.1}

no evidence in this case that a half of the expansion joint could not be lifted, if properly rigged without incident and placed in the filter house.

It is the plaintiff's contention that despite the expertise of boilermakers and all of the engineers at Kiewit who were on site, they somehow could not figure out how to connect the two pieces on the ground and lift the expansion joint as one piece. Instead, without any communication whatsoever with Joenic requesting some advice, Kiewit and the boilermakers decided to lift the expansion joint in halves, apparently completely ignoring the center of gravity in the configuration of the rigging and the selection of the pick points on the joint. It was during the lift of the first half of the expansion joint that the incident occurred.

### III.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". Fed.R.Civ.P. 56(a). A "genuine" issue exists where there is a "sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party". *Byrne v. Chester City Hosp.*, 09-889, 2012 U.S. Dist. LEXIS 133992, 212 W.L. 4108886, at *2 (E.D. Pa. Sept. 19, 2012) (citing *Kacher v. City of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)); See *Liberty Supply Ins. Cor. v. McFadden's at Ballpark, LLC*, 116 F.Supp. 3d 447; 2015 U.S. Dist. LEXIS 89615 "a factual dispute is 'material' if it might affect the outcome of a case under governing law". *Byrne*, supra. All factual doubts should be resolved and all reasonable inferences drawing in favor of the non-moving party. *Torretti v. Main Line Hosp., Inc.*, 580 F.3d 168, 172 (3d Cir. 2009 (citing *DL Res., Inc. v. FirstEnergy Solutions Corp.*, 506 F.3d 209, 216 (3d Cir. 2007)). "The inquiry

3

performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Jiminez v. All American An Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 2002 (1986)).  "[U]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Byrne*, 2012 U.S. Dist. LEXIS 123992, 2012 W.L. 4108886, at *2.  The movant is responsible for "informing the court of the basis for its motion for summary judgment and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact."  Id.  (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  *The Liberty Surplus Ins. Corp. v. McFadden's at Ballpark, LLC*, (U.S.D.C.E.D.P., 116 F.Supp. 3d 447, 2015, U.S. Dist. LEXIS 89615.

## IV.  DISCUSSION

### A.

The events giving rise to this matter occurred on the morning of September 24, 2020 at the Hill Top Energy Center located in Greene County during the construction of a very large and complex power plant known at the Hill Top Energy Center.  The general contractor for the project was Kiewit Power Constructors ("Kiewit").  The supplier of the turbines for the construction of the power plant was General Electric ("GE") who were experts in the design and assembly of portions of the power plant generally referred to as the turbines.  Part of the assembly involved the construction of a filter house which connected to the gas turbines.  A subpart of the filter house was duct

4

work which consisted of expansion joints.  It was during the course of lifting a part of an expansion joint into place that the incident occurred whereby Mr. Donnelly, the plaintiff was injured.

Joenic Steel was a subcontractor of General Electric and prepared detailed drawings of the filter house and expansion joint based on the drawings and specifications provided to Joenic by General Electric.  After Joenic completed its drawings and instructions, they were submitted to General Electric who reviewed all of the drawings and instructions and approved them.  Thereafter, Joenic made arrangements for the manufacture of the steel components for shipment to the job site. Joenic contracted with a steel company in China to whom the drawings and specifications were provided and the components, including the expansion joint were manufactured.  Thereafter they were shipped to the United States and transported by tractor trailer from the west coast to the energy center located in Greene County.

The component involved in this particular case was an expansion joint.  This particular joint was extremely large and therefore, it had to be shipped in halves.  When the trucks arrived at the job site, the components of the expansion joint were off loaded from the trucks and placed in what is known as the laydown yard.  In order to preserve the integrity of the expansion joints, there were long pieces of steel referred to as shipping brackets which were connected to the halves. Each half looked like a large C and the shipping brackets were connected at the mid points of the short sides of the C to the mid-point of the long side.  The shipping brackets were not part of the component and were to be removed at the final installation.  The shipping brackets were painted bright yellow to designate that they were only temporary.  Since the components were

5

manufactured in China, bolts and nuts connecting the shipping bracket to the expansion joint were metric.

During the normal course of the construction of the filter house, the expansion joints were moved from the laydown yard to the location where they were going to be lifted into place in the filter house.  The temporary shipping brackets were on both sides of the expansion joint but when the joint was placed into its final position, the shipping brackets were to be removed.   However, the Kiewit employees, those being the boilermakers and their technical personnel, ended up removing the brackets on at least three separate occasions and reinstalling them.

The drawings provided by GE and Joenic indicated that the expansion joint was to be assembled as one piece and lifted as one piece.  It is the contention of the plaintiff that the drawings, instructions and the absence of a splice plate to accomplish the joining of the two halves were deficient and as such, the product was defective.  Instead of contacting Joenic to inquire about the appropriate way to connect the two halves, Kiewit and its employees decided to lift each half separately, which could have been done very easily had proper procedures been followed.   In the course of Kiewit's attempts to figure out exactly how they were going to lift the expansion joint either as one component or in halves, they removed and replaced the shipping brackets including the bolts and nuts on multiple occasions.  There is little doubt that the metric bolts did not have nuts on them immediately prior to the lift taking place, or the boilermakers placed standard nuts on the metric bolts which were connecting the shipping brackets to the expansion joint when the joints initially arrived at the job site.  Kiewit, as it was responsible to do as the erector determined the means an method of lifting the half of

6

the expansion joint. That required locating the center of gravity and then attaching the rigging of the crane to the expansion joint so that it could be lifted and placed in its proper position in the filter house. It was during the lift of the expansion joint that a shipping bracket came loose and struck Mr. Donnelly who was standing under the expansion joint and assisting the crane operator.

It is undisputed that the reason the shipping bracket came loose from the expansion joint is because the bolts did not secure the shipping bracket firmly to the expansion joint. Immediately following the incident, Kiewit conducted an investigation and searched the area for any evidence and located two bolts. Both of the bolts were metric bolts and they had had some yellow paint on them. There appears to be little doubt that the bolts which were located were bolts which secured the shipping bracket to the expansion joint. The initial inspection of the bolts by Kiewit indicated that the threads were stripped or sheared. The bolts did not break nor did the heads of the bolts come off of the shaft. It is clear that the bolts were stripped or sheared as a result of being under great tension and stress during the lifting of the expansion joint which caused the bolts to pull out of the holes in the bracket and joint and that is what caused the deformation of the threads. It is also undisputed, because there is no evidence to the contrary, that the bolts did not have any nuts on them or that the boilermakers inadvertently placed standard nuts on the bolts. The likelihood that is that there were no nuts on the bolts because there were no nuts found in the area whether metric or standard. The failure to properly secure the shipping brackets to the expansion joint was obviously an oversight by the Kiewit employees during the multiple occasions when

they were removing the shipping brackets and putting them back on and removing the bolts and reattaching the bolts to the shipping brackets and expansion joint.

What is significant is that despite there being multiple experts addressing the issue of liability, none of the plaintiff's experts have suggested or opined that there was any other cause of the incident other than the failure of the bolts to secure the shipping brackets on the expansion joint, or that one half of the expansion joint could not have been lifted safely had proper procedures been followed.

During the course of Kiewit's investigation of the incident, they provided the two bolts which were located at the scene to a company called Simpson, Gumpertz & Heger, experts in engineering of structures and building enclosures. A request was made for a metallurgical analysis of the bolts which was performed and Simpson, Gumpertz provided a report which has been marked as Exhibit C in order to show the bolts which were located and the condition of the bolts. Unfortunately, Simpson, Gumpertz lost the bolts. However, the company was able to test the bolts and the determination was that the bolts met their design capacity and would have been sufficient to connect the shipping brackets to the expansion joint assuming that there were proper nuts compatible with the metric bolts.

It is the contention of the plaintiff that, presumably the expansion joint, was a defective product because the drawings and the instructions did not explain exactly how to connect the two halves together and that an additional item, known as a splice plate should have been provided. However, a number of the liability experts who testified in this case during depositions opined that the lift of one half of the expansion joint could have been accomplished without any problem had the shipping brackets been securely

8

secured to the expansion joint and had Kiewit and its employees properly calculated the center of gravity, and thereby, determined the appropriate pick points on the expansion joint in order to lift it taking into consideration the center of gravity. The plaintiff's liability experts do not address the fact that the lift of one half of the expansion joint could have been made without incident, nor have they refuted the opinions of the defense experts who have opined that the lift of one half of the expansion joint could have taken place safely had the Kiewit personnel taken into consideration the center of gravity and made sure the shipping brackets been securely attached to the expansion joint. The testimony of not only the expert witnesses, but that of personnel who were on site at the time establishes that Kiewit was solely responsible for the incident occurring.

A very important and unbiased witness to the events leading up to and at the time of the incident is Miranda Blackstone. Ms. Blackstone was working as an oiler assisting James Martin, who was operating the crane which was carrying out the lift at the time of the incident. Ms. Blackstone was deposed on July 27, 2023 and provided significant information concerning exactly what took place leading up to and at the time of the incident. She related that the boilermakers who were on site and involved in the placement of the expansion joint into the filter house expressed concerns about the lift as it was rigged. She remembers that the lift was supposed to take place a few days before the incident but they had an issue with the rigging so the boilermakers took it off and put it back on perhaps one or more times. (Exhibit F, Deposition Testimony of Miranda Blackstone, p. 25, ll. 16-244). Ms. Blackstone also testified that the shipping brackets on the expansion joint were changed and reversed at various times prior to the lift. With respect to the actual rigging, she stated that "I know that the boilermakers did

not like the set for it from the experiences with rigging." (Id. p. 26, ll. 1-2). She recalled a discussion with two of the boilermakers who were in the crew along with Mr. Donnelly, those being Mike Boyd and Chad Boyd who both expressed reservations regarding the lift and what was likely to happen. (Id. p. 35, ll. 16-18). Not only did Ms. Blackstone have discussions with the boilermakers in the crew who were involved in the lift, but she also talked to a foreman of another crew who was on site and he was also of the opinion that in the way the rigging was taking place it was not going to be safe to carry out the lift. (Id. p. 37, ll. 15-25). All of the boilermakers who were on site and watching the lift take place observed that it was twisting and the bottom was not stable and the top was wiggling. (Id. p. 42, ll. 3-18). She also remembers that when the lift was actually taking place they had to stop because the expansion joint was moving and that is when the deflection started. (Id. p. 47, ll. 7-17). The shipping bracket which eventually broke loose from the expansion joint had been removed and reinstalled as many as three times that she can recall. The shipping bracket was taken off and put back on. (Id. p. 50, ll. 10-23). She specifically recalls there were discussions among the boilermakers and "[T]hey just said that they knew that something was going to go wrong with that. They all said it prior as well. Well most of them did. I remember people saying I am staying away from this." (Id. p. 89, ll. 20-24). As stated earlier, at no point in time during the two possibly three days that the boilermakers were trying to figure out how to lift the expansion joint did any one contact Joenic.

The Kiewit Incident Alert – Final report (Exhibit D) establishes that the bolts which were used to secure the shipping bracket to the expansion joint exceeded the design capacity and would have been acceptable to use during the lift had a metric nut

{P1991948.1}

been placed on the metric bolt.  It is clear that the bolt did not break, but sheared as a result of being pulled through the holes of the expansion joint and the shipping bracket assuming there were no nuts on the bolts or the nuts, which were standard ones, pulled off of the metric bolts due to incompatibility.

Mark Oliver, Ph.D., is a liability witness retained on behalf of G.E.  He was deposed on November 14, 2024 and testified that the Kiewit engineers on site and the boilermakers should have considered the center of gravity before rigging the expansion joint for placement in the filter house.  Dr. Oliver testified that had the boilermakers accurately determined the center of gravity being the experts in rigging along with the technical staff at Kiewit who were on site, the expectation would have been that they would have put the tag points on the expansion joint on either side of the expansion joint taking into consideration the center of gravity.  This way it would have assured that when the lift took place, the ends stayed parallel and did not twist with respect to one another.  (Exhibit G, Deposition Testimony of Mark Oliver, Ph.D., p. 59, ll. 7-23).  Not only did Dr. Oliver opined that determining the center of gravity prior to rigging the expansion joint for a lift was essential, but the plaintiff's liability experts, Dr. Stichter and Dr. Lanning also acknowledged that it was essential to determine the center of gravity when determining the location of the pick points.  Dr. Oliver testified that it was obvious from the twisting and flexing of the expansion joint when it was being lifted as depicted in the photograph, Exhibit B, that the joint was twisting and flexing.  (Exhibit G, Deposition Testimony of Mark Oliver, Ph.D., p. 60, ll. 12-25; p. 61, ll. 1-2).

Dr. Michael Stichter, Ph. D., P.E., who was retained by the plaintiff as an expert on the issues of liability, was deposed on October 16, 2024.  He testified that he would

have expected the Kiewit personnel and the boilermakers to have asked questions regarding the appropriate way to perform the lift. He testified that he believes that there were certain personnel who were approached with questions, but there is no evidence that anyone concerned with the project contacted Joenic to ask questions. (Exhibit E, Deposition Testimony of Michael Stichter, Ph.D., P.E., p. 165, ll. 6-19). Dr. Stichter, like all of the liability experts, testified that based on his examination of the photograph of the lift, Exhibit B, he would have been very concerned about the lift proceeding. (Exhibit E, Stichter Deposition, p. 167, ll. 3-22).

Dr. Wade Lanning, Ph.D., co-authored the report issued by ARCCA with Dr. Stichter. Dr. Lanning was deposed on November 5, 2024. Dr. Lanning acknowledged that he was of the opinion that "using Match M12 nuts on M12 bolts would correct the manufacturing defect, making the bracing strong enough to survive the maximum torsion – maximum torsion the expansion joint could exert." (Exhibit H., Dr. Wade Lanning Deposition, p. 135, ll. 18-25; p. 136, ll. 1-8). When Dr. Lanning was questioned by counsel for Joenic, he related that he would cross that particular section out of the report because it was apparent that he agrees with the opinions of Joenic's liability expert, Dr. David Bizzak. That being due to the multiple disassembly and assembly of the shipping brackets on the expansion joint and the multiple changes with the bolts and nuts, the boilermakers probably put a standard nut on a metric bolt or simply in their rush failed to put any nut on a metric bolt securing the shipping bracket to the expansion joint. The deposition of Dr. David Bizzak, Ph.D., P.E., the liability expert retained on behalf of Joenic, was taken on December 20, 2024. He confirmed that the failure was the result of a mismatch of a metric bolt and a standard nut, or the absence of any nuts

on the bolts securing the shipping bracket to the expansion joint. (Exhibit K, Dr. Bizzak Deposition, p. 52, ll. 15-21; p. 59, ll. 20-21; p. 60, ll. 12-16).

Dr. Lanning was also questioned at length about the necessity of determining the center of gravity prior to rigging the expansion joint for the lift. He acknowledged like all the experts that locating the center of gravity was essential to a proper and safe rigging. (Exhibit H, Dr. Lanning Deposition, p. 143, ll. 18-25). Finally, Dr. Lanning, like Dr. Stichter, the plaintiff's experts, testified that had he been on site and observed the way the lift was taking place as depicted in the photograph, Exhibit B, he would have shut it down. (Exhibit H., Dr. Lanning Deposition, p. 152, ll. 14-17). It is obvious that had Kiewit and the boilermakers selected the correct pick points on the one half of the expansion joint which was being lifted it could have been performed without incident. (Exhibit G, Deposition of Dr. Oliver, p. 61, ll. 18-25; p. 62, ll. 1-7).

What is significant is the fact that the plaintiff's experts, Dr. Stichter and Dr. Lanning, do not offer any opinions regarding the proper way to lift the half of the expansion joint without incident. Other than Dr. Lanning's comment that had metric nuts been placed on the metric bolts securing the shipping brackets to the expansion joint, the lift could have been performed without incident and there would have been no defect. All of the experts agree that the failure mode was the stripping or shearing of the bolts and not the breaking of the bolts. A mismatch of the bolts and nuts or the absence of nuts was solely the responsibility of Kiewit and the boilermakers.

G.E.'s expert, Duane Cochran. P.E., testified that Kiewit being the general contractor, was responsible for site safety and for the means and methods of the lift and was responsible for a safe lift. This is pursuant to the general contractors' written

agreement. Also, according to AISC, *Code of Standard Practice for Steel Buildings and Bridges*, Kiewit as the general contractor and involved in the erection of the steel, was responsible for the means, methods and safety of the lift.

B.

The plaintiff has set forth four separate counts, V – VIII, against Joenic Steel which include a claim based on a theory of negligence, a claim based on strict liability/consumer expectation, another claim based on strict liability/risk utility and finally, a claim for breach of warranty.

Pennsylvania strict products liability law follows the *Restatement (Second) of Torts §402a*. *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 395 (Pa. 2014). In a design defect claim, the plaintiff must show that (a) product was defective; (b) the defect proximately caused the plaintiff's injuries; and (c) the defect existed at the time the product left the defendant's control. See, *Pavlik v. Lane Ltd./Tobacco Exp., Int'l.*, 135 F.3d 876, 881 (3d Cir. 1998). The plaintiff has the burden of proving that the product was defective by offering evidence of (1) a design defect, (2) a manufacturing defect, or (3) a failure to warn. It is a little bit unclear from the plaintiff's complaint exactly what theory the plaintiff is proceeding upon. Presumably it is a design defect insomuch as the plaintiff contends the instructions and drawings which accompanied the expansion joint lacked certain specificity and that perhaps the expansion joint was defective because a splice plate was not provided though such could easily have been obtained by Kiewit had it thought to do such. There has been a great deal of testimony throughout the proceedings regarding the bolts, but all the evidence is that the bolts were not defective, but instead either standard nuts were placed on metric bolts or there

14

were no nuts placed on the bolts and the failure mode was a shearing or stripping of the bolts.

To prove a design defect, plaintiff has the burden of establishing either (1) that the product's danger is unknowable and unacceptable to the average or ordinary consumer (the consumer expectations analysis) or (2) that a reasonable person would conclude that the probability and seriousness of harm that a product causes outweighs the burden or cost of taking precautions (the risk/utility test).  See, *Tincher*, 104 A.3d at 389; *Land v. Rock Exotica, LLC*, 2:23-cv-04627-JDW, 245 U.S. Dist. LEXIS, decided April 16, 2025.

## 1.    <u>Consumer Expectations Test</u>

Pursuant to *Tincher*, a "product is not defective if the ordinary consumer would reasonably anticipate and appreciate the dangerous condition of the product and the attendant risk of injury of which the plaintiff complains."  *Id.* at 387 (internal citations omitted).  The analysis has to be based on a determination of whether the product was "unsafe for its intended user".  *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1007 (Pa. 2003).  The *Tincher* court characterized the tests as reflecting the "surprise element of danger" latent in the products use.  *Tincher*, 104 A.3d at 387.  The United States District Court for the Eastern District of Pennsylvania in *Land* stated that the test is whether the product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community. . . ."  *Land*, 2025 U.S. Dist. LEXIS 72011, pp. 5-6.  The plaintiff's theory of strict liability based on the "consumer expectation" theory has no applicability to this particular case.  That is because the parties involved including the plaintiff were not

every day consumers of the expansion joint and the construction of the filter house. Kiewit/boilermakers are experts in the field of construction and immediately recognized the lack of a specific instruction about how to connect the two halves of the expansion joint. Furthermore, and pursuant to AISC *Code of Standard Practice for Steel Buildings and Bridges,* Kiewit was responsible for determining the means, methods and safety of lifting the expansion joint. It was solely the responsibility of Kiewit and the boilermakers to lift the expansion joint in a safe and proper manner. Furthermore, there was nothing about the expansion joint or the lack of specific direction on how to connect the two halves in order to be lifted as one which was dangerous or vague to the extent that it was outside the ordinary consumer's contemplation. Again, Mr. Donnelly was not an ordinary consumer nor were any of his co-workers and the employees of Kiewit who were on site. The District Court in *Land*, which relied heavily on *Tincher*, pointed out that the Supreme Court relied heavily on the California Supreme Court decision in *Soule v. Gen. Motors Corp.*, 882 P 2d 298 (Cal. 1994). In *Soule*, the court explained that the consumer expectation test is reserved for cases in which the everyday experience of the products users permits a conclusion that the products' design violated minimum safety assumptions, and is thus defective regardless of the expert opinion about the merits of the design. *Id.* at 308. The District Court in *Land* also stated that judges of this court have relied on *Soule*, as instructive about the scope of the consumer expectations test. *Land*, 2025 U.S. Dist. D. LEXIS 72011, p. 6. As amply supported by the testimony of Ms. Blackstone and plaintiff's liability experts Dr. Stichter and Dr. Lanning, it was very apparent that the means and methods by which the expansion joint was being lifted were extremely dangerous and that as the lift was taking place the

16

expansion joint was twisting and flexing. This was all due to the undisputed fact that Kiewit/boilermakers never took into consideration the center of gravity or if they determined the center of gravity they never took into consideration rigging the expansion joint in a manner that considered the center of gravity. Therefore, it is submitted that the consumer expectations concept of strict liability has no application to the subject case.

The court in *Land*, in assessing the reasonable consumer's expectations relied on *Tincher*, when commenting that in order to make a reasonable assessment of the consumer's expectations it is necessary to consider "the nature of the product, the identity of the user, the products intended use and intended user, and any express or implied representations by the manufacturer or seller." *Tincher*, 104 A.3d at 387, *Land*, at 6. The product in this case, that being the expansion joint, was not a consumer product. The identity of the user was the energy center and there were no specific, implied or expressed representations by Joenic and/or General Electric. The product itself was completely safe for its intended purposes and was installed subsequent to the incident and it has not malfunctioned in any manner. The only reason the incident occurred was because of the missteps of Kiewit and the boilermakers in carrying out the lift of one half of the joint which could have been performed safely had they exercised reasonable care in planning and used the proper means and methods of carrying out the lift.

## 2.    Risk/Utility Test

The risk/utility test concept of a strict liability has no merit or application to the present case. That test relies on considering a seller's interest vs. a consumer's

{P1991948.1}

interest from the perspective of a reasonable seller. In *Tincher*, the Pennsylvania Supreme Court provided 7 factors relative to an analysis of the risk/utility test. They are as follows:

- The usefulness and desirability of the product – its utility to the public as a whole.

- The safety aspects of the product – the likelihood that it will cause injury, and the possible seriousness of the injury.

- The availability of a substitute product which would meet the same need and not be unsafe.

- The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

- The user's ability to avoid danger by the exercise of care in the use of the product.

- The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions, and

- The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

(*Tincher*, 104 A.3d at 389-390.)

Since the expansion joint was not a consumer product, the risk utility test is irrelevant in this case. All that Kiewit had to do to effectuate a proper and safe lift of the expansion joint was to rig it in the appropriate manner and insure that all of the bolts had nuts were on and properly tightened and that the nuts were metric to be compatible with the metric bolts. If, as mentioned by Ms. Blackstone, the contemplation of this lift took place over two, possible three days due to the confusion of the Kiewit personnel on site, a call to Joenic would have immediately solved the problem. A splice plate would have been sent prior to the incident as opposed to after the incident when Joenic was first notified of the incident, or Kiewit could have asked the local machine shop to manufacture a small splice plate. The boilermakers testified that Ms. Carrano, the Kiewit engineer on site went out and purchased a number of new pieces of hardware, such as nuts and bolts before the lift took place, so nothing would have prevented Kiewit from having a splice plate manufactured. As stated at the outset, one of the three key elements to a products liability case is that the defect caused the plaintiff's injuries. The undisputed evidence is that the alleged defect, whether deficiencies in the drawing and instructions or the absence of the slice bar, did not cause Mr. Donnelly's injuries. His injuries were caused solely by the conduct and actions of Kiewit and their employees, the boilermakers.

## NEGLIGENCE

In order to prevail upon a claim of negligence, the plaintiff must show (1) a duty that the law recognizes, (2) a failure on the defendant's part to comport to that duty, or a breach of it, (3) a causal connection between the defendant's breach and the resulting injuries and (4) actual loss or damage that the plaintiff suffered. *Alcovitz v. Gulph Mills*

{P1991948.1}

*Tennis Club, Inc.*, 812 A.2d 1218, 1222 (Pa. 2002).  It is the plaintiff's contention in Count V of the complaint that Joenic was negligent in failing to exercise reasonable care and from placing into the stream of commerce an expansion joint, shipping steel and hardware that was in a defective condition and/or unreasonably dangerous for its foreseeable and/or intended use, and duty to instruct and/or warn plaintiff and others concerning the alleged defective condition.  (Exhibit 1, Count V.)  Joenic has specifically denied the allegations of negligence.  The testimony and evidence in this case has clearly established that there were no deficiencies or defects in the shipping steel and the hardware.  The sole cause of the accident was Kiewit and the boilermakers' failure to make sure that the shipping steel was properly connected to the expansion joint after it had been removed multiple times and replaced, and the lift of the half of the expansion joint was performed in an improper, and dangerous manner which multiple witnesses agreed upon.  The plaintiff's own experts acknowledge the lift was done in an unsafe manner and they would have stopped it if they had been present.  It is submitted that even if there was some negligence on the part of Joenic because of lack of specificity in the drawings, the completely unexpected and unforeseeable conduct of Kiewit and the boilermakers was a superseding cause of the incident.    Under Pennsylvania law, "a superseding cause is an act of a third person or other force which, by its intervention, prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about".  *Von der Heide v. Commonwealth, Department of Transportation*, 553 Pa. 120, 718 A.2d 286, 288 (Pa. 1998).  Also see *Bole v. Erie Insurance Exchange*, 616 Pa. 479, 50 A.3d 1256 (Pa. 2012).  As stated repeatedly, Kiewit personnel on site and the boilermakers were not

{P1991948.1}

every day consumers. They were experts in the field of construction and assembly of very large power plants and similar structures. Pursuant to the AISC Code, Kiewit was solely responsible for determining the means, methods and safety of lifting the expansion joint. There was nothing improper or defective about the shipping brackets. The original bolts and nuts which attached the shipping bracket to the expansion joint were completely suitable for their purposes and met all standards. The lift of one half of the expansion joint could have been done properly had Kiewit and the boilermakers taken time to not only calculate the center of gravity, assuming that they did not, or if they did, locating the pick points on the expansion joint taking into consideration the center of gravity as opposed to rigging the joint in a cockeyed manner. The plaintiff's experts, those being Dr. Stichter and Dr. Lanning, by design or oversight do not refute that a half of the expansion joint could have been lifted had the center of gravity been calculated and considered. Furthermore, and as mentioned above, Dr. Lanning agreed with Dr. Bizzak, Joenic's liability expert, that had the boilermakers during the multiple changes of the shipping brackets placed M12 nuts on the M12 bolts that would have corrected any manufacturing defect and would have made the bracing strong enough to survive the lift of the expansion joint. (Exhibit H, p. 135, ll. 18-25; p. 136, ll. 1-8).

Based on the undisputed evidence in this case, there is no question that the conduct and actions of Kiewit/boilermakers was a superseding cause of the incident and prevents any finding of liability on the part of Joenic on any of the plaintiff's theories.

## BREACH OF WARRANTY

The plaintiff also includes a claim for breach of warranty alleging that Joenic breached expressed and implied warranties. However, there is no legal basis or factual

{P1991948.1}

basis for such claims.  It is the contention of the plaintiff that Joenic breached the expressed warranties that the expansion joint, shipping steel and hardware were free from defect and that the expansion joint, shipping steel and hardware were functioning properly during their foreseeable and intended use.  There were no defects in the expansion joint, the hardware or the shipping steel.  Had it not been for Kiewit and its employees failing to secure the shipping steel to the expansion joint prior to the lift there would have been no problem with the installation of one half of the expansion joint.  Furthermore, the only reason that the shipping steel came off of the expansion joint was because of the improper rigging designed by Kiewit and its employees and the failure of the boilermakers to place nuts on the bolts securing the shipping steel to the expansion joint or placing standard nuts on metric bolts prior to the lift taking place.

The plaintiff also contends that Joenic breached warranties because the expansion joint, shipping steel and hardware were not fit to the particular purpose for which they were sold, and they failed to adequately perform their intended use and were generally not merchantable.  It is submitted that the expansion joint was fit for its particular purpose because it was in fact installed in the filter house exactly as it was intended, there is no evidence that it failed to perform in the manner intended or that it was in any way unmerchantable.  One half of the expansion joint could have been lifted in a safe manner and placed in the filter house without incident had Kiewit and its employees established the center of gravity, made the appropriate decisions with respect to the location of the pick points and made sure that the original bolts and nuts which attached the shipping bracket to the expansion joint were on securely.

## CONCLUSION

Although the instructions and the drawing could have been more precise, the sole cause of the incident was the conduct and actions of Kiewit and its employees. There is no question that the reason that the shipping bracket came off of the expansion joint was due to the fact that it had been removed and replaced at least three times maybe more and when it was replaced on the last occasion, the boilermakers either failed to put any nuts on the bolts or carelessly placed standard nuts on metric bolts. The scene was immediately secured and a careful inspection of the area was conducted by Kiewit and only two bolts were located. One would expect that if there were nuts that were on those bolts they would have also been located and preserved.

Also, the plaintiff's liability experts as well as the defense experts all agree that had the lift been rigged properly and taken into consideration of the center of gravity the lift could have been made without incident, assuming that the bolts were secure. Both of the plaintiff's liability experts testified that they would have been very concerned about the lift and probably would have shut it down.

Also, all of the personnel on the site employed by Kiewit were experts in the field of construction. There is no reason why all of these experts could not have considered a splice plate which is a technique which most people are familiar with through common sense. During the two or three days that this lift was being contemplated, and the brackets were removed and replaced on numerous occasions, no one from Kiewit or any of the boilermakers made a phone call to Joenic asking for some guidance. One phone call would have prevented the incident. It is submitted that Joenic Steel is entitled to summary judgment as a matter of law.

{P1991948.1}

Respectfully submitted,

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, P.L.L.C.

Date: 5-5-2025

ERIC N. ANDERSON, ESQUIRE
Counsel for Defendant,
JOENIC STEEL, LLC
PA I.D. 18183
eanderson@mdbbe.com
MEYER, DARRAGH, BUCKLER,
  BEBENEK & ECK, P.L.L.C.
Firm No. 198
U.S. Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219-6194
Telephone No.: (412) 261-6600
Fax No.: (412) 471-2754

24

{P1991948.1}

## PROOF OF SERVICE / CERTIFICATE OF COMPLIANCE

This is to certify that a true and correct copy of the foregoing document has been served upon all parties on the date and in the manner listed below and I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

|  |  |
|---|---|
| _____ | First Class Mail, Postage Prepaid |
| _____ | Certified Mail - Return Receipt Requested |
| _____ | Hand Delivery |
| _____ | Facsimile Transmission |
| _____ | Overnight Delivery |
| _____ | Electronic Mail |
| ___X___ | CM/ECF Filing |

at the following address:

David Kennedy Houck, Esquire
dhouck@allinfirm.com
OGG, MURPHY & PERKOSKY, PC
245 Fort Pitt Boulevard
Pittsburgh, PA 15222
*(Counsel for Plaintiff)*

Joseph V. Lesinski, Esquire
jvlesinski@mdwcg.com
MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
Unit Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219
*(Counsel for General Electric Company)*

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, P.L.L.C.

Date: 5-5-2025

ERIC N. ANDERSON, ESQUIRE
PA I.D. 18183

Counsel for Defendant,
JOENIC STEEL, LLC

{P1991948.1}